# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | CRIMINAL ACTION FILE |
| v. ) | |
| ) | NO. 1:16-CR-315-02-TWT-AJB |
| ELGIN BYRD, ) | |
| Defendant. ) | |

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Defendant Elgin Byrd (hereinafter "Byrd" or "Defendant") is charged in the indictment with two counts of distributing heroin, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2 (Counts One and Two); one count of conspiring to assault a confidential informant ("CI") of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and robbing the CI, by use of a firearm, of money and property of the United States then in the lawful custody of the CI, in violation of 18 U.S.C. § 371 (Count Three); assaulting the CI with a firearm, in violation of 18 U.S.C. §§ 111(a)(1), (b) and 2 (Count Four); committing armed robbery of United States property against the CI, in violation of 18 U.S.C. §§ 2114(a) and 2 (Count Five); using, carrying, and brandishing a firearm during the crimes of violence charged in Counts Four and Five, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2

(Count Six); and possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(l), 924(a)(2), and 924(e) (Count Eight). [Doc. 10].

He challenges, by way of a motion to suppress, the voluntariness of his post-arrest statements, [Doc. 31]. The Court held an evidentiary hearing, [Doc. 38 ("T__")], and the parties thereafter filed briefs, [Docs. 41 (Govt.), 50 (Byrd), 51 (Govt.)]. For the following reasons, the undersigned **RECOMMENDS** that the motion, [Doc. 31], be **DENIED**.

*Facts*

On August 9, 2016, at approximately 11:40 a.m., an ATF CI attempted to buy guns and heroin from Byrd at 617 Echo Street, Apt. 4, located in the English Avenue area of Atlanta. T4-5. After leaving the apartment where she discussed the upcoming transaction with Byrd, the CI was robbed by Byrd's co-defendant Michael Simpson. T5-6, 31. The surveilling agents saw the robbery through a pole-mounted video camera. T6; Govt. Ex. 1. The agents rescued the CI, but Simpson fled. T6. He was arrested later that day. T31.

Approximately one hour later, at 12:37 p.m., ATF agents executed federal search warrants at Apts. 4 and 5 at 617 Echo Street. T6-7. The agents called Byrd and other apartment occupants to come down the stairs, and Byrd acceded to the order and came

2

downstairs, where he immediately was handcuffed. T10-11. Byrd, along with two other occupants from Apt. 4 and three occupants of Apt. 5, were placed against the side of the building while the search warrants were executed. T11; Govt. Ex. 1 at 8:00.

A few minutes after his initial detention, Byrd was briefly questioned for biographical information, and a warrants check disclosed an outstanding Cobb County warrant against him. T12. He remained seated next to the building for approximately twenty-two minutes. Govt. Ex. 1 at 17:19-39:37. He then was escorted to an Atlanta Police Department ("APD") patrol car by APD Officer Delain at approximately 1:17 p.m. T13-14. The pole camera video does not show Byrd stumbling while being moved. Govt. Ex. 1 at 39:38-40:10.

ATF Special Agent ("SA") Nash approached Byrd in the patrol car approximately thirty minutes later. T14-15. Byrd was alone in the vehicle and handcuffed in the rear. T14. Byrd responded to Nash's instruction to get out of the car by exiting the vehicle. T14-15. Nash placed Byrd beside a retaining wall. T17. Nash and APD Sgt. Lester were present with Byrd. T16-17. Nash described Byrd's demeanor as normal, T15, and neither Nash nor Lester threatened or yelled at Byrd. *Id.* The officers did not brandish their weapons. T17.

3

Nash's first attempt to *Mirandize* and interview Byrd were not recorded because Nash's cell phone did not record the questioning despite three attempts. T18. Nash read Byrd his *Miranda* rights from a preprinted card. T18; Govt. Ex. 4.[1] Byrd agreed to talk to Nash. T18. This questioning and encounter lasted approximately five minutes. T19. Byrd appeared to understand his rights, stated that he had no questions about his rights, and agreed to speak with the agents. T18, 49-50. During this questioning, Byrd discussed his living situation and his previous arrest by the ATF, and he stated that he had snorted approximately one-quarter gram of heroin at about 11:00 a.m. that morning. T24, 35-36; *see also* Govt. Ex. 11 at 1.

ATF SA McLeod provided Nash with a working recorder. T18-19. Nash moved Byrd to another location, about fifty feet away, to an abandoned house next to the

---

[1] Govt. Ex. 4 provided:

Before I ask you any questions, I want to explain your rights to you.
You have the right to remain silent.
Anything you say can be used against you in a court of law.
You have the right to consult with a lawyer before questioning and to have a lawyer present during questioning.
If you cannot afford a lawyer, one will be appointed to represent you free of charge prior to any questioning.
Do you understand your rights?
Are you willing to waive these rights and talk to me now without a lawyer being present?

AO 72A
(Rev.8/82)

search location, where Byrd walked up the stairs and sat on the porch area. T19. Once he had a functioning recording device, Nash (now accompanied by ATF SAs Williams and McLeod) first explained that he previously read Byrd his rights and that Byrd agreed to speak to them, and Byrd acknowledged that he had. Govt. Ex. 11 at 1. As Nash was reiterating what they had discussed when the recorder was not functioning, including where Byrd lived and that he had snorted a quarter gram of heroin earlier that morning, Nash told Byrd, "Come on, wake up for me." *Id.* Nash repeated that Byrd had told him that he had gotten the heroin from "Bo-Bo," which statement Nash described as "full of crap," and "I told you man, things going to help you [sic] is if you tell us the truth." *Id.* Byrd stated that he got the heroin the day before. *Id.*

In reference to the robbery of the CI, Byrd first stated that he just saw people standing around outside, but after Nash asked him if he wanted to change that statement, Byrd admitted that he knew of the plan to "fake sell" guns to the CI, and he described "Mike" as his partner. *Id.* at 1-2, 4. When Byrd stated that it was just he and Mike involved, Nash told him that they "just need[ed] to know the truth" and not to get someone not involved in trouble. *Id.* at 5. Byrd denied that his stepson was involved in the robbery any more than overhearing conversations. *Id.* at 5-6. In telling Byrd that if he (Nash) found out that the stepson was involved and that Byrd was lying, Nash told

5

Byrd that "this is your time to shine." *Id.* at 6. Byrd explained that "Mike" was going to rob the CI and that he and "Mike" would split the proceeds. *Id.* at 6.

Byrd also admitted to selling up to six grams of heroin a day. *Id.* at 7. When Nash tried to describe Byrd as drug partners with "Skinny," Byrd replied that it "ain't nothing but a habit" and that he was not making any money selling drugs. *Id.* He stated that he was selling grams of heroin for $100-120 because he was paying $80 per gram for it. He appeared to be surprised when Williams stated that other dealers were paying $35-40 per gram. *Id.*

Byrd also acknowledged that he was trying to wean himself off of his heroin habit, which at its height was two to three grams a day. *Id.* at 9. He had been using heroin since he was a kid. *Id.* When the agents asked him about fentanyl, Byrd explained that it was hard to get and that he could tell the fentanyl-laced heroin by its taste, which was more chemical-like. *Id.* at 9-10. He tried to avoid doing it because of what he has seen it do to people. *Id.* at 10. He described the activities of a woman named "Mom" or "Ma" who mainly sold pills in the neighborhood. *Id.* at 10-11.

When Nash asked for the names of other persons who were selling drugs in the English Avenue area, Byrd replied that he "would want it to be right" if he told him, i.e., "I wouldn't want to just spit a name out and that name ain't you know, beneficial

6

like it need to be." *Id.* at 12. He admitted that he had a firearm temporarily for protection but that he disposed of it. *Id.*

More than halfway through the questioning, as Nash was explaining that he would be placed in detention and appear in court the next morning, Nash stated that after Byrd obtained a lawyer when he went to court, "if you want to talk to us, when you maybe start figuring some stuff out. Maybe once you get off of what you [are] on right now. . . Come down a little bit, maybe start thinking a little bit clearer." *Id.* at 13. Byrd stated that he would be willing to speak to them some more. *Id.* Nash explained that they were trying to "help you help yourself." *Id.*

The agents then questioned him about his sources of supply for heroin. Govt. Ex. 11 at 13-14. Nash accused Byrd of giving him a "bullshit name" and "that's full of crap. Come on, Byrd, you know who it is." *Id.* Williams told him "this is the part where you help yourself. You start providing us good information, we can tell the U.S. Attorney, hey, he was cooperative and he provided us some good names." *Id.* at 14. Byrd was advised that they could not make him any promises, and if he identified his source they would not disclose to the source that his identity came from Byrd. *Id.* Nash then asked him whether he was buying from "Slim," "Skinny," or "Knot Knot." *Id.* Byrd stated that he sometimes bought from Skinny, but that Skinny

7

did not have a lot of drugs, and that he bought drugs from Knot Knot "now and then," but Byrd was "trying to get right," that is, stop using drugs. *Id.*

At the conclusion of the questioning, when the agents were trying to decide whether to first release him to Cobb County, Nash again asked him for more information, to which Byrd responded, "I been spitting out a whole bunch of gibberish. I need to get—." *Id.* at 15. He was asked if there was anything else he wanted to "get off your chest," because (despite his earlier statement that once Byrd had a lawyer he could talk to them again), Nash advised that this was his chance and "this is it." *Id.* Byrd responded "I can't think of shit." *Id.* at 15-16. Nash responded that if there was anything else, to just have his lawyer contact the agents. *Id.* at 16.

After a brief discussion about the robbery, Nash removed Byrd's handcuffs and discussed with him a consent to search his cell phone and the prior recitation of his *Miranda* rights. He showed him the card from which he earlier read Byrd his *Miranda* rights, with Byrd acknowledging that it was the same card, that he read it to him, and that Byrd consented to talking to him. *Id.* at 16-17.

Byrd signed a consent-to-search form as to his cell phone. He explained that the had an eleventh-grade education. *Id.* at 17. Nash then read to Byrd the *Miranda*

8

warnings, after which Byrd signed the form. *Id.* at 17-18; Govt. Ex. 5. Byrd acknowledged that he was not threatened. Govt. Ex. 11 at 19.

During the questioning, Byrd did not seek to stop the questioning or ask to speak to a lawyer. T43.

Nash testified that Byrd appeared to be under the influence of drugs and manifested some of the behaviors that he knew of someone under the influence of heroin; that is, he had a depressed posture, was leaning over, and had a relaxed muscle tone; his eyes were droopy and his pupils were constricted; and at times, he was slow to respond to questions. T27-29, 51. On two occasions during the questioning, Byrd appeared to "nod off," and Nash told him to open his eyes. T28.

### *Issues*

Byrd first argues that his *Miranda* waiver was involuntary because Nash got him to answer questions with the hope of a benefit or implied promise to help him, and that it was not until later in the interview when he was told that the agents were not making him any promises and that they would simply tell the prosecutor that he cooperated. [Doc. 50 at 9]. Therefore, he contends, his waiver was involuntary and not knowing, considering that he did not know whether speaking with Nash was helpful to him, pointing to his statement during the questioning that he " 'd[idn]'t know if I'm

9

goddamn talking myself in a deeper whole or not,' " [*id.* at 10 (quoting Govt. Ex. 11 at 4)], to which Nash did not respond, eventually telling Byrd it was Byrd's " 'time to shine' " and " 'we're trying to help you help yourself.' " [*Id.* at 10 (quoting Govt. Ex. 11 at 6, 13)].

Byrd next argues that his *Miranda* waiver was not knowing as to the nature of the rights being abandoned and consequences of the abandonment decision, since he was a heavy user of heroin, was under the influence of heroin at the time of the questioning, exhibited a number of signs of heroin use, had to be awakened by Nash, and stated that he was speaking gibberish. [*Id.*]. Although he acknowledges that merely being under the influence is not sufficient to make a properly warned statement unreliable or involuntary, he argues that he was under the influence of heroin to the extent that his will was overborne. [*Id.* at 10-11]. He also argues that his statements were involuntary because the agents implied a promise to help him on four occasions before finally telling him that their help was limited to contacting the Assistant U.S. Attorney. [*Id.* at 11].

### *Discussion*

The government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of *Miranda v. Arizona*,

10

AO 72A
(Rev.8/82)

384 U.S. 436 (1966), and were otherwise voluntary. *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *Colorado v. Connelly*, 479 U.S. 156, 168 (1986); *Miranda*, 384 U.S. at 475.

Under *Miranda*, "evidence obtained as a result of a custodial interrogation is inadmissible unless the defendant had first been warned of his rights and knowingly waived those rights." *United States v. Parr*, 716 F.2d 796, 817 (11th Cir. 1983). The government must prove by a preponderance of the evidence that the defendant waived his rights knowingly and voluntarily. *United States v. Glover*, 431 F.3d 744, 748 (11th Cir. 2005). An accused effectively waives his *Miranda* rights if he: (1) voluntarily relinquishes them as the product of a free and deliberate choice, rather than through intimidation, coercion or deception; and (2) makes his decision with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them. *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995). Thus, a waiver is effective where the totality of the circumstances reveals both an uncoerced choice and the requisite level of comprehension. *United States v. Ransfer*, 749 F.3d 914, 935 (11th Cir. 2014) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see also United States v. Wright*, 300 Fed. Appx. 627, 632 (11th Cir. Nov. 12, 2008) (citing *Barbour*, 70 F.3d at 585). "An express written or oral

AO 72A
(Rev.8/82)

statement of waiver . . . is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *United States v. Johnson*, 379 Fed. Appx. 964, 968 (11th Cir. May 24, 2010). A defendant need not, however, understand all of the consequences of the waiver. He need only understand his right to remain silent or have his statements used against him. *Colorado v. Spring*, 479 U.S. 564, 574 (1987); *see also United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir. 1990) (to determine whether a waiver was intelligent, the court should "inquire whether the defendant knew that he did not have to speak to police and understood that statements provided to police could be used against him . . . A suspect need not, however, understand the tactical advantage of remaining silent in order to effectuate a valid waiver.").

The focus of the voluntariness inquiry is on whether the defendant was coerced by the government into waiving his rights: "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Connelly*, 479 U.S. at 170 (alteration and internal quotation marks omitted). The Court should consider the totality of the circumstances in assessing whether any police conduct was "causally related" to the waiver. *See Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988). This

12

totality-of-the-circumstances test directs the Court ultimately to determine whether a defendant's waiver was the product of "an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). Among the factors the Court should consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996), *overruled on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009). However, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent . . . ." *Gonzalez*, 71 F.3d at 828 (citations omitted). Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984).

In addition, in any arrest or custodial situation there is present a degree of duress. The question is whether the officers used coercive tactics or took unlawful advantage of the situation to obtain the defendant's waiver or statements. *Cf. United States v.*

13

*Jones*, 475 F.2d 723, 730 (5th Cir. 1973)[2] (discussing consent to search following arrest). Moreover, while a defendant's mental condition is a " 'significant factor' " in the " 'voluntariness calculus,' " *Miller*, 853 F.2d at 1536 (quoting *Connelly*, 479 U.S. at 520), even the interrogators' knowledge that a suspect may have mental problems does not make the suspect's statement involuntary unless " '[t]he police exploited this weakness *with coercive tactics*.' " *Miller*, 853 F.2d at 1357 (quoting *Connelly*, 479 U.S. at 521 (emphasis in *Miller*)).

Separate and apart from compliance with *Miranda*, the government also must establish that a custodial defendant's statements were voluntary. *United States v. Sims*, 719 F.2d 375, 378 (11th Cir. 1983) ("First, the court considers whether the government has complied with the *Miranda* requirements. Upon finding compliance with *Miranda*, the court then rules on the confession's voluntariness."); *see also Jarrell v. Balkcom*, 735 F.2d 1242, 1252 & n.11 (11th Cir. 1984) (observing that although *Miranda* and *Jackson v. Denno*, 378 U.S. 368 (1964), protect Fifth Amendment rights, *Jackson* "raises an issue distinct from the *Miranda* question in determining a confession's

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to September 30, 1981.

14

admissibility. . . [and] [t]hus, even if a court finds compliance with *Miranda*, the court must still rule on the confession's voluntariness").

Voluntariness of statements is analyzed similarly to voluntariness of the *Miranda* waiver. Again, however, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent . . . ." *Gonzalez*, 71 F.3d at 828 (citations omitted). Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *Castaneda-Castaneda*, 729 F.2d at 1362-63. Isolated incidents of police deception, *id.*; *Frazier v. Cupp*, 394 U.S. 731, 739 (1969), and discussions of realistic penalties for cooperative and non-cooperative defendants, *see United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992); *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990), are normally insufficient to preclude free choice.

After careful consideration, the undersigned concludes that Byrd's statements are not subject to suppression. First, Byrd's *Miranda* waiver was voluntary and knowingly obtained. The undisputed evidence is that Nash read the rights to him off of his

15

preprinted card; once Nash was able to record the interview, Byrd acknowledged that the rights were read to him and that he agreed to answer questions; and, of much lesser significance, after the questioning was nearly over, Nash read the rights to him again and Byrd executed a written waiver. Thus, Byrd was aware of the rights that he had.

Next, Byrd's waiver of the rights was voluntary. Although he was under the influence of heroin at the time of is arrest, there is no evidence that Nash or any other law enforcement officer coerced him into waiving those rights or took advantage of him because he was high on drugs. *See United States v. Harris*, No. 4:11-cr-18-HLM-WEJ, 2011 WL 5514003, at *7 (N.D. Ga. Oct. 21, 2011), *adopted by* 2011 WL 5514058, at *7-8 (N.D. Ga. Nov. 10, 2011) (finding that statement was voluntary even when defendant appeared to be under the influence of drugs because there was no evidence that the defendant lacked sufficient mental capacity to understand and waive his rights). He was not physically assaulted beyond the minimal force used to handcuff him and move him to several locations. There is no evidence that the police yelled at him or made any promises to him to get him to give up his rights. While Byrd claims that the police made at least an implicit promise to help him in exchange for information (a claim addressed *infra*), any such statements were made *after* Byrd waived his *Miranda* rights.

16

Moreover, the Court rejects Byrd's argument that his statement expressing doubt as to whether his statements were helping or hurting him show that he did not comprehend what he was waiving. He knew that he was waiving his right to remain silent; what he did not understand was whether his incriminatory statements would make the case against him worse or whether his cooperation would help him. As the *Hernandez* court recognized, a suspect need not understand the tactical advantage of remaining silent in order to effectuate a valid waiver. *Hernandez*, 913 F.2d at 1510; *cf. Moran*, 475 U.S. at 422 ("[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights."). In fact, Byrd's rhetorical question about the value of the information he was giving, as well as his recognition that it would not be in his interest to give the officers information without getting a benefit in return, Govt. Ex. 11 at 12, demonstrate that he knew that he had a right to not answer questions.

Further, neither Nash or the other agents took advantage of Byrd's intoxication or otherwise coerced him to waive his rights. There is no evidence that they withheld medical assistance or other aid from him, and the one or two times that Nash told Byrd

17

to wake up does not amount to the type of coercion necessary to render a *Miranda* waiver involuntary.

Second, Byrd's statements were not improperly obtained. Initially, the Court rejects Byrd's argument that his statements were rendered involuntary by promises made to him by the interrogating officers. As one commentator has noted, statements inducing the hope of leniency in the mind of the suspect " 'are only objectionable if they establish an express *quid pro quo* bargain for the confession.' " 2 Wayne R. LaFave, *Criminal Procedure* § 6.2(c) at 624 n.101 (3d ed. 2007). A "mere prediction" of favorable treatment upon cooperation, unlike a promise of a lower sentence, does not qualify as a will-overbearing coercive tactic, *id.* at 624 n.100, even where that prediction turns out to be wrong. This is the view of the Eleventh Circuit. *See United States v. Quinn*, 123 F.3d 1415, 1423-24 (11th Cir. 1997) (police did not improperly induce defendant's confession by telling him that "he was facing a 46-year sentence but might receive a more favorable sentence if he cooperated" and that "it would be more difficult to cooperate once an attorney had been appointed"); *Nash*, 910 F.2d at 752 (telling defendant "that cooperating defendants generally 'fared better time-wise' " did not amount to illegal inducement); *United States v. Davidson*, 768 F.2d 1266, 1271 (11th Cir. 1985) (law enforcement assurance that "the accused's

18

cooperation would be passed on to judicial authorities and would probably be helpful to him is not a sufficient inducement so as to render a subsequent incriminating statement involuntary"); *cf. United States v. Beale*, 921 F.2d 1412, 1435 (11th Cir. 1991) (government failed to establish that Spanish-speaking suspect's *Miranda* waiver was voluntary where agents told him his statements "would not hurt him," thereby effectively nullifying the *Miranda* warnings).

Moreover, the officers' beseeching Byrd "to tell the truth" does not make his statements involuntary. *United States v. Hipp*, 644 Fed. Appx. 943, 947 (11th Cir. Mar. 1, 2016) ("A mere admonition to the accused to tell the truth does not render a statement involuntary.") (citing *United States v. Vera*, 701 F.2d 1349, 1364 (11th Cir. 1983)); *see also United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978) ("Encouraging a suspect to tell the truth and suggesting that his cohorts might leave him 'holding the bag' does not, as a matter of law, overcome a confessor's will, even though he or she may be sixteen years of age. Neither is a statement that the accused's cooperation will be made known to the court . . . .") (citation omitted).

Finally, Byrd's intoxication did not render the statements involuntary for the same reasons that it did not prevent him from knowingly and voluntarily waiving his *Miranda* rights. In addition to the reasons discussed previously, law enforcement did

19

AO 72A
(Rev.8/82)

not take advantage of his heroin-induced state, since Nash acknowledged that his cooperation would require his getting more clearheaded and that *if* he wanted to cooperate, they could wait until his lawyer was representing him. Further, Byrd's recognition that he should not tell the police certain information until it was beneficial for him to do so, Govt. Ex. 11 at 12, is an indication that he voluntarily chose what questions to answer and which ones not to.

Based on the totality of circumstances, therefore, Byrd's post-arrest statements on August 9, 2016, were voluntarily obtained. As a result, the undersigned **RECOMMENDS** that his motion to suppress statements, [Doc. 31], be **DENIED**.

The Court has now recommended a ruling as to those dispositive motions referred pursuant to Standing Order 14-02 (N.D. Ga. Aug. 15, 2014). Further, the parties have not reported any impediments to the scheduling of a trial. Therefore, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED and CERTIFIED**, this ___7th___ day of August, 2017.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

20